FILED
U.S. DISTRICT COURT
2019 MAR 12  AM II: 02

CLERK'S OFFICE
AT BALTIMORE

BY_____DEPUTY

REUBEN ASH
    *Plaintiff,*

    v.

MARYLAND TRANSIT
ADMINISTRATION
    *Defendant.*

Civil Action No. ELH-18-1216

## MEMORANDUM OPINION

In this disability discrimination case, plaintiff Reuben Ash has sued the Maryland Transit Administration ("MTA," "Maryland," or the "State"), alleging violations of Title II of the Americans with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. §§ 12131-12165, as well as violations of the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 794 *et seq.* ECF 1 ("Complaint"); ECF 20 ("Amended Complaint"). Plaintiff seeks declaratory relief; actual, compensatory, and punitive damages; and attorneys' fees and costs. ECF 20 at 8-9. Plaintiff also seeks to enjoin defendant and its employees from refusing to make reasonable accommodations as necessary to afford plaintiff equal opportunity to use and enjoy defendant's services. *Id.* at 8.

Defendant has filed a partial motion to dismiss (ECF 21), supported by a memorandum of law (ECF 21-1) (collectively, the "Motion"). According to defendant, plaintiff's ADA claim is subject to dismissal under Fed. R. Civ. P. 12(b)(1) because, under the Eleventh Amendment to the Constitution, the MTA is immune from suit. Plaintiff opposes the Motion, arguing that Congress validly abrogated the State's immunity under Title II of the ADA. ECF 22 ("Opposition"). Defendant filed a reply. ECF 23 ("Reply").

In addition, defendant has filed a "Motion to Strike Prayer for Punitive Damages" (ECF 24), supported by a memorandum of law (ECF 24-1) (collectively, the "Motion to Strike"). No reply has been filed, and the time to do so has expired. *See* Local Rule 105.2.

No hearing is necessary to resolve the motions. *See* Local Rule 105.6. For the reasons that follow, I shall deny the Motion but grant the Motion to Strike.

## I.     Factual and Procedural Background[1]

The MTA is a State agency that provides public transportation throughout Maryland. It "owns and operates a 'commuter bus service' along a 'fixed route system[.]'" ECF 20, ¶ 5 (quoting 49 C.F.R § 37.3).

Ash "is paralyzed from the waist down" and "uses a wheelchair for mobility." *Id.* ¶ 4. He alleges that he is a "qualified individual with a disability" under the ADA. *Id.* At all relevant times, Ash resided in Baltimore and "relied upon MTA's buses to travel throughout Baltimore City, including travel to medical appointments and to obtain access to governmental and public buildings and obtain governmental and public services." *Id.* ¶ 12. According to Ash, MTA employees intentionally denied him access to its commuter buses on at least eleven occasions between October 6, 2016 and December 16, 2017. *Id.* ¶ 14. "In each instance, the MTA bus driver could see that Mr. Ash was disabled and needed to rely on the use of [a] wheelchair." *Id.* Yet, each one allegedly refused to allow Ash entry to the bus. *Id.*

For example, on October 3 and October 6, 2016, the bus driver on duty allegedly saw Ash in his wheelchair, but, refused to stop the bus. *Id.* ¶ 14(a), (b). And, on October 14, 2016, the bus driver told Ash that the ramp was broken. When Ash asked the driver to operate the ramp manually,

---

[1] Given the posture of the case, the Court must assume the truth of Ash's factual allegations. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).

"the driver did not respond and closed the door and left without allowing Mr. Ash to enter." *Id.* ¶ 14(c). In another instance, the driver would not lower the ramp, leaving Ash at the bus stop. *Id.* ¶ 14(h). Then, on yet a different occasion, the driver would not manually operate a broken ramp. Ash was able to board only after passengers volunteered to operate the ramp. *Id.* ¶14 (g).

On October 31, 2016, the driver refused to allow Ash onto the bus because "he did not want to ask passengers to leave the disability seats, when those passengers were not disabled and were not senior citizens." *Id.* ¶ 14(d). On November 4, 2016, another driver refused to ask passengers to leave the disability seats, leaving Ash at the stop instead. *Id.* ¶ 14(e). Three days before Christmas, the bus driver allowed several passengers to enter the bus, closed the door, and smiled when Ash was the next person to board. *Id.* ¶ 14(f).

On January 13, 2017, the bus driver refused to open the door to allow Ash to board. *Id.* ¶14(g). On April 18, 2017, the driver did allow Ash to enter the bus. *Id.* ¶ 14(j). On December 16, 2017, the bus driver allowed six people to board the bus, and then "while shaking her head 'no,' shut the door in front of Mr. Ash and drove away." *Id.* ¶ 14(k).

In each instance, the MTA bus driver allegedly saw that Ash was disabled but nevertheless "intentionally refused to allow [him] to enter the bus and therefore excluded [him] from participation in the benefits of public transportation." *Id.* ¶ 14. With one exception, Ash "was left stranded even though he was otherwise capable of using the bus service[.]" *Id.* He "had to suffer the humiliation of being left at the bus stop or having to beg other passengers to operate the ramp manually when the driver claimed that the ramp was not working mechanically and the driver refused to operate the ramp manually." *Id.* ¶ 18.

Ash claims that as a consequence of the discrimination, he "was left with no reliable means of transportation." *Id.* ¶ 19. Therefore, according to Ash, he missed medical appointments and other obligations, and could not "perform his daily, basic activities." *Id.* ¶ 14.

According to Ash, in November 2011, the MTA issued a specific bulletin to its bus operators, instructing them to lower the bus ramp for people who use wheelchairs. *Id.* ¶ 15. But, bus drivers refused to lower the ramp after Ash asked them to do so. *Id.* Moreover, Ash alleges that the "MTA does not properly inspect and maintain the ramps on the buses despite their knowledge of frequent problems with the ramps." *Id.*

Ash also asserts that he has filed several complaints with the MTA. But, he claims that the violations continue. *Id.* ¶ 16.

Additional facts are included in the Discussion.

## II.    Standard of Review

As noted, the MTA has moved to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, asserting that plaintiff's claims are barred by sovereign immunity. Under Rule 12(b)(1), plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction. *See Demetres v. East West Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); *see also The Piney Run Preservation Ass'n v. Cty. Comm'rs of Carroll Cty., Md.*, 523 F.3d 453, 459 (4th Cir. 2008); *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).

A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either a facial challenge, asserting that the allegations pleaded in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting "'that the jurisdictional allegations of the complaint [are] not true.'" *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted); *accord Durden v. United States*, 736 F.3d 296, 300 (4th Cir.

2013). In a facial challenge, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns*, 585 F.3d at 192. On the other hand, in a factual challenge, "the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction." *Id.* In that circumstance, the court "may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *see also United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347-48 (4th Cir. 2009); *Evans*, 166 F.3d at 647. The MTA raises a facial challenge to the Court's subject matter jurisdiction, based on the four corners of the Amended Complaint.

The Fourth Circuit has reiterated that the defense of sovereign immunity is a jurisdictional bar, stating that "'sovereign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction.'" *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018) (quoting *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 207 (5th Cir. 2009)). But, the defendant "bears the burden of demonstrating" sovereign immunity, because it is "akin to an affirmative defense." *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014).

### III.   The ADA and Its Regulations

The ADA was enacted in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." *Id.* § 12101(b)(2). The ADA contains five

titles: Title I, Employment; Title II, Public Services; Title III, Public Accommodations; Title IV, Telecommunications; and Title V, Miscellaneous Provisions.

Of relevance here, Title II of the ADA prohibits public entities, including "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government," *id.* § 12131(1), from discriminating "by reason of" disability against a "qualified individual with a disability." *Id.* § 12132. For purposes of Title II, a "qualified individual with a disability" is defined as an individual with a disability "who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). Title II of the ADA applies to "'anything a public entity does.'" *Seremeth v. Bd. of County Comm'rs of Frederick County*, 673 F.3d 333, 338 (4th Cir. 2012) (citing cases) (citations omitted); *see also Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 380-81 (D. Md. 2011) (collecting authority).

Title II also includes provisions targeted at discrimination in public transportation. *See* 42 U.S.C. §§ 12141-50, 12161-65. With some exceptions, Title II prohibits public entities from purchasing or leasing new buses or light rail vehicles that are not wheelchair accessible. 42 U.S.C. §§ 12142, 12145. It also requires certain public entities operating a fixed route transportation system to develop paratransit services for individuals with disabilities, including those who use wheelchairs. *Id.* § 12143.

In addition, Congress directed the United States Department of Transportation ("DOT") to promulgate regulations implementing the parts of Title II that address public transportation. 42 U.S.C. §§ 12143 (regulations pertaining to paratransit); 12149 (regulations pertaining to

paratransit and transportation by intercity and commuter rail); and 12164 (regulations pertaining to public transportation by intercity and commuter rail). DOT regulations prohibit public entities from "deny[ing] to any individual with a disability the opportunity to use the entity's transportation service for the general public, if the individual is capable of using that service." 49 C.F.R. § 37.5.

In service of this prohibition, the entity must ensure that bus operators "make use of accessibility-related equipment." 49 C.F.R. § 37.167(e). "Where necessary or upon request," the bus operators also must "assist individuals with disabilities with the use of securement systems, ramps and lifts." 49 C.F.R. § 37.165(f).

"Public and private entities providing transportation services" also must "maintain in operative condition those features of facilities and vehicles that are required to make the vehicles and facilities readily accessible to and usable by individuals with disabilities." 49 C.F.R. § 37.161(a). Such features include "lifts, and other means of access to vehicles . . . ." *Id.* Although the state must "promptly" repair "[a]ccessibility features . . . if they are damaged or out of order," "isolated or temporary interruptions in service or access due to maintenance or repairs" are permitted. *Id.* § 37.161(b)-(c). "When an accessibility feature is out of order," the state "shall take reasonable steps to accommodate individuals with disabilities who would otherwise use the feature." *Id.* § 37.161(b).

It is well established that private parties may sue to enforce Title II of the ADA. *Barnes v. Gorman*, 536 U.S. 181, 184-85 (2002); *Pandazides v. Virginia Bd. of Educ.*, 13 F.3d 823, 828 (4th Cir. 1994); *Davis v. Southeastern Community Coll.*, 574 F.2d 1158, 1159 (4th Cir. 1978), *rev'd on other grounds*, 442 U.S. 397 (1979). *Cf. Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582 (1983) (establishing that Title VI of the Civil Rights Act of 1964 supports a private right of action). To prevail under an ADA Title II claim, "a plaintiff must show that [he or] she was excluded from

7

participation in, or denied the benefits of, a program or service offered by a public entity, or subjected to discrimination by that entity." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005) (emphasis omitted). To that end, the Fourth Circuit has recognized "three distinct grounds for relief: (1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations." *Helping Hand*, 515 F.3d at 362.

There are limitations as to the scope of Title II. *Constantine*, 411 F.3d at 488. Before an individual "can even invoke the nondiscrimination provisions of the statute," the plaintiff must make a "threshold showing" that he or she is a "'qualified individual with a disability.'" *Id.* Moreover, a state is only required to make reasonable accommodations. *Id.* at 489.

The term "reasonable accommodations," which is derived from the employment discrimination provisions of Title I of the ADA, is essentially synonymous with the term "reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services," 42 U.S.C. § 12131(2), which is what Title II of the ADA requires a public entity to provide. *See, e.g., Robertson v. Las Animas County Sheriff's Dept.*, 500 F.3d 1185, 1195 n.8 (10th Cir. 2007) ("Title II's use of the term 'reasonable modifications' is essentially equivalent to Title I's use of the term 'reasonable accommodation.'"); *McGary v. City of Portland*, 386 F.3d 1259, 1266 n.3 (9th Cir. 2004) ("Although Title II of the ADA uses the term 'reasonable modification,' rather than 'reasonable accommodation,' these terms create identical standards.").

8

## IV. Abrogation of Sovereign Immunity

### A. Waiver, Prospective Relief, and Abrogation

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another state, or by Citizens or subjects of any Foreign State." The Eleventh Amendment did not create sovereign immunity. Rather, it preserved the sovereign immunity that the states enjoyed prior to the formation of the Union. *See Alden v. Maine*, 527 U.S. 706, 724 (1999); *see also Sossamon v. Texas*, 563 U.S. 277, 284 (2011). The preeminent purpose of state sovereign immunity is "to accord states the dignity that is consistent with their status as sovereign entities[.]" *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002).

Thus, states generally enjoy immunity from suits brought in federal court by their own citizens. *See Hans v. Louisiana*, 134 U.S. 1, 3 (1890); *see also Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356, 363 (2001) ("The ultimate guarantee of the Eleventh Amendment is that nonconsenting states may not be sued by private individuals in federal court."). In other words, under the Eleventh Amendment, a private individual is barred from bringing a suit against a state in federal court to recover damages, unless the state consents or there is an exception to sovereign immunity. *See Coleman v. Court of Appeals of Md.*, 556 U.S. 30, 35 (2012) ("A foundational premise of the federal system is that States, as sovereigns, are immune from suits for damages, save as they elect to waive that defense."); *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247 (2011); *see also Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54–55 (1996) ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States was not contemplated by the Constitution when establishing the judicial power of the United States.") (internal quotation marks and citation omitted); *Edelman v. Jordan*, 415 U.S. 651 (1974).

Of import here, absent waiver or a valid congressional abrogation of sovereign immunity, sovereign immunity also bars suit against an instrumentality of a state, sometimes referred to as an "arm of the state." *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."). The MTA is a State agency, entitled to sovereign immunity. *McCray v. Md. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014) (recognizing that the MTA is entitled to sovereign immunity); *see also Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *Bland v. Roberts*, 730 F.3d 368, 389 (4th Cir. 2013); *Constantine*, 411 F.3d at 479.

The Fourth Circuit has noted three exceptions to the Eleventh Amendment's prohibition of suits against a state or an arm of the state. In *Lee-Thomas v. Prince George's Cty. Pub. Sch.*, 666 F.3d 244 (4th Cir. 2012), the Court said, *id.* at 249 (internal quotations omitted):

> First, Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority. *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) . . . . Second, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law. *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) . . . . Third, a State remains free to waive its Eleventh Amendment immunity from suit in a federal court. *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618 (2002).

Although Ash seeks injunctive relief, among other remedies, he has not sued a state official. In addition, Maryland has not waived its Eleventh Amendment immunity to a suit of this kind in federal court. *See* ECF 21-1 at 4 (defending this suit on the grounds of sovereign immunity). Therefore, only the first exception is relevant here.

**B.    Congress's Constitutional Authority To Abrogate Sovereign Immunity**

"Congress may abrogate the States' Eleventh Amendment immunity, but only by stating

unequivocally its desire to do so and only pursuant to a valid exercise of constitutional authority."

*Constantine*, 411 F.3d at 484 (citing *Seminole Tribe*, 517 U.S. at 55).

Section 502 ("State Immunity") of the ADA provides:

> A State shall not be immune under the eleventh amendment to the Constitution of
> the United States from an action in Federal or State court of competent jurisdiction
> for a violation of this Act. In any action against a State for a violation of the
> requirements of this Act, remedies (including remedies both at law and in equity)
> are available for such a violation to the same extent as such remedies are available
> for such a violation in an action against any public or private entity other than a
> State.

Accordingly, the Supreme Court and Fourth Circuit have recognized that Congress

unequivocally intended the ADA to abrogate sovereign immunity. *United States v. Georgia*, 546

U.S. 151, 154 (2006); *Tennessee v. Lane*, 541 U.S. 509, 518 (2004); *Garrett, supra*, 531 U.S. at

363-64; *Constantine*, 411 F.3d at 484. "The question, then, is whether Congress had the power to

give effect to its intent." *Lane*, 541 U.S. at 518; *accord Constantine*, 411 F.3d at 484.

"Although the commerce power conferred by Article I of the Constitution does not

authorize Congress to abrogate the States' Eleventh Amendment immunity, the Supreme Court

has held that 'the Eleventh Amendment, and the principle of state sovereignty which it embodies,

are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment.'"

*Constantine*, 411 F.3d at 484 (quoting *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976)) (internal

citations omitted); *see also Seminole Tribe*, 517 U.S. at 73 ("Article I cannot be used to circumvent

the constitutional limitations placed upon federal jurisdiction."). That is, "Congress may subject

nonconsenting States to suit in federal court when it does so pursuant to a valid exercise of its § 5

power." *Garrett*, 531 U.S. at 364; *see also Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 80 (2000).

Section 1 of the Fourteenth Amendment provides, U.S. CONST. amend. XIV, § 1:

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.

Section 5 provides Congress with "power to enforce, by appropriate legislation," the Fourteenth Amendment. Accordingly, "[i]t is for Congress in the first instance to 'determin[e] whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment,' and its conclusions are entitled to much deference." *City of Boerne v. Flores*, 521 U.S. 507, 536 (1997) (quoting *Katzenbach v. Morgan*, 384 U.S. 641, 651 (1966)).

Indeed, Congress's Section 5 enforcement power is a "broad power." *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 732 (1982). Section 5 empowers Congress "not only to codify the Supreme Court's holdings concerning the rights established by the Fourteenth Amendment, but also to deter future violations of the Fourteenth Amendment." *Constantine*, 411 F.3d at 484. Therefore, Congress may "'prohibit[] a somewhat broader swath of conduct, including that which is not itself forbidden by the [Fourteenth] Amendment's text.'" *Lane*, 541 U.S. at 518 (quoting *Kimel*, 528 U.S. at 81). That is, through "prophylactic legislation" Congress may "proscribe[] facially constitutional conduct, in order to prevent and deter unconstitutional conduct." *Nevada Dep't of Human Resources v. Hibbs*, 538 U.S. 721, 727-28 (1997). Moreover, Section 5 authorizes Congress "to enact prophylactic legislation proscribing practices that are discriminatory in effect, if not in intent, to carry out the *basic objectives* of the Equal Protection Clause." *Lane*, 541 U.S. at 520 (emphasis added).

For example, in *Hibbs*, 538 U.S. 721, the Court considered whether the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*, abrogated sovereign immunity. There, a male employee sued his state employer for damages for failing to provide medical leave in compliance

with the Act. The state had not adopted its leave policy with a discriminatory intent and therefore did not violate the Fourteenth Amendment. *See Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256 (1979). Nevertheless, the Court recognized that Congress had validly enacted the FMLA under its Section 5 power as prophylactic legislation to deter unconstitutional sex discrimination. *Hibbs*, 538 U.S. at 729-40.

Congress's Section 5 enforcement authority is not unlimited, however. As the Supreme Court explained in *Boerne*, 521 U.S. at 518, Congress may enforce the Fourteenth Amendment, but Congress may not reinterpret it. "While the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law is not easy to discern, and Congress must have wide latitude in determining where it lies, the distinction exists and must be observed." *Id.* at 519-20; *accord Fla. Prepaid Postsecondary Ed. Expense Bd. v. College Savings Bank*, 527 U.S. 627, 639 (1999).

According to the Supreme Court, "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Boerne*, 521 U.S. at 520. To determine "congruence and proportionality," courts employ a three-step analysis. First, the court must identify the right at issue. Second, it must determine whether there was a history of discrimination. Third, it must determine whether the remedies are congruent and proportional to the violations. *Constantine*, 411 F.3d at 484-89.

In *Garrett, supra*, 531 U.S. 356, the Supreme Court applied this three-part test to Title I of the ADA. The Court observed that Congress had compiled significant evidence of private-sector employers discriminating against the disabled, but little evidence of discrimination by public sector employers. *Id.* at 368-72. Therefore, it concluded that Title I of the ADA failed to abrogate state sovereign immunity. *Id.* at 374. Nevertheless, the Court expressly declined to address Title II. *Id.*

13

at 360 n. 1.

In *Lane*, the Supreme Court considered whether Title II properly abrogated sovereign immunity. Rather than ruling on Title II in its entirety, the Court held that "Title II, as it applies to the class of cases implicating the fundamental right of access to the courts, constitutes a valid exercise of Congress' § 5 authority to enforce the guarantees of the Fourteenth Amendment." *Lane*, 541 U.S. at 533-34. The Court did not decide "whether Title II's duty to accommodate exceeds what the Constitution requires in the class of cases that implicate only [the constitutional] prohibition on irrational discrimination" against the disabled. *Id.* at 533 at n. 20; *see also Heller v. Doe*, 509 U.S. 312, 320 (1993); *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 446 (1985). That is, the Court did not address whether Title II is congruent and proportional remedy when a non-fundamental right is at issue.

But, the Fourth Circuit considered this question in *Constantine*, 411 F.3d at 488. The Court concluded that although public education is not a fundamental right, Title II properly abrogated sovereign immunity as to public higher education. *See also San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 29-40 (1973) (recognizing the "pivotal role of education" in our society but rejecting the argument that education is a fundamental right and applying rational-basis review to an equal-protection challenge to a state's system of school financing); *Sellers v. School Bd. of Manassas, Va.*, 141 F.3d 524, 531 (4th Cir. 1998) (stating that a plaintiff challenging the disparate treatment of disabled students "would have to prove that a school board's decision was without any rational basis").

In *Georgia*, 546 U.S. at 159, the Supreme Court held that "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." The Court also

14

provided a three-part test to "give guidance to lower courts determining whether the Eleventh Amendment bars an ADA Title II claim." *Kobe v. Haley*, 666 F. App'x 281, 301 (4th Cir. 2016) (citing *Georgia*, 546 U.S. at 159); *see also Spencer v. Earley*, 278 F. App'x 254, 258 (4th Cir. 2008). Under the test, lower courts must "determine . . . , on a claim-by-claim basis, (1) which aspects of the state's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Georgia*, 546 U.S. at 159.

The claim-specific analysis in Title II cases is necessary. "While § 5 authorizes Congress to enact reasonably prophylactic remedial legislation, the appropriateness of the remedy depends on the gravity of the harm it seeks to prevent." *Lane*, 541 U.S. at 523-24. "[D]ifficult and intractable problems often require powerful remedies," but "strong measures appropriate to address one harm may be an unwarranted response to another, lesser one." *Id.*

## V.     Application of the *Boerne* Test

Ash maintains that the MTA excluded him from the use of the MTA bus system. On at least eleven occasions, MTA bus operators allegedly (1) refused to stop for Ash; (2) stopped, but refused to allow him to enter the bus; (3) refused to lower the ramp or lift that he needed to board the bus independently; or otherwise (4) refused to assist him in boarding the bus. *Id.* ¶ 14. Ash claims that "he was left with no reliable means of transportation," *id.* ¶ 19, and "was excluded . . . from participation in the benefits of public transportation." *Id.* ¶ 14. As a result, Ash alleges a violation under Title II of the ADA, although he does not allege a constitutional violation.

The MTA maintains that the Title II·is not congruent and proportional in this case and therefore does not abrogate sovereign immunity. It places significant weight on *Everybody*

*Counts, Inc. v. Indiana Reg'l Planning Comm'n,* No. 2:98-CV-97, 2006 WL 2471974, at \*11-13 (N.D. Ind. Mar. 30, 2006), quoting at length from the district court's opinion. ECF 21-1 at 9-11.

Ash takes the opposite position. He argues that this Court should follow the Fourth Circuit's analysis in *Constantine,* which recognized that Title II abrogated sovereign immunity in the context of public higher education. ECF 22 at 8-9. He also points to *Mote v. City of Chelsea,* 284 F. Supp. 3d 863, 879-80 (E.D. Mich. 2018), in which the district court concluded that Title II is congruent and proportional "as applied to equal access to publicly-maintained sidewalks, curb ramps, and parking areas." *See* ECF 22 at 9.

### A. The Constitutional Right at Issue

"Because classifications based on disability are subject to minimal scrutiny, States may make distinctions on the basis of disability so long as 'there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.'" *Constantine,* 411 F.3d at 486 (quoting *Heller,* 509 U.S. at 320); *see also Cleburne,* 473 U.S. at 446. Accordingly, the Court must consider the right to be free from irrational discrimination with respect to public transportation serving a metropolitan area. "States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions toward such individuals are rational." *Garrett,* 531 U.S. at 367.

Although not directly at issue, the right to travel is implicated here. The Supreme Court has "firmly established that the right of interstate travel is constitutionally protected." *Griffin v. Breckenridge,* 403 U.S. 88, 105 (1971); *see also United States v. Guest,* 383 U.S. 745, 757 (1966). The Fourth Circuit has also noted that "there is language in various [Supreme Court] cases that could be viewed as supporting the existence" of a right to intrastate travel as well. *Willis v. Town of Marshall, N.C.,* 426 F.3d 251, 265 (4th Cir. 2005).

Indeed, the Supreme Court "long ago recognized that the nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement." *Shapiro v. Thompson*, 394 U.S. 618, 629-30 (1969). The Court has also explained: "In all the states, from the beginning down to the adoption of the Articles of Confederation, the citizens thereof possessed the fundamental right, inherent in citizens of all free governments, peacefully to dwell within the limits of their respective states, to move at will from place to place therein, and to have free ingress thereto and egress therefrom, with a consequent authority in the states to forbid and punish violations of this fundamental right." *United States v. Wheeler*, 254 U.S. 281, 293 (1920); *see also Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (noting that a statute requiring loiterers on public streets to provide police upon request with "credible and reliable" identification "implicates consideration of the constitutional right to freedom of movement"); *Williams v. Fears*, 179 U.S. 270, 274 (1900) ("[T]he right to remove from one place to another according to inclination, is an attribute of personal liberty, and the right, ordinarily, of free transit from or through the territory of any state is a right secured by the 14th Amendment and by other provisions of the Constitution.").

The Fourth Circuit has not, to my knowledge, decided whether the right to intrastate travel is fundamental. *See Willis*, 426 F.3d at 265. But, as indicated above, courts have generally recognized the constitutional significance of free movement and travel. Indeed, "the guarantee of the ability freely to travel in the public way is among the most fundamental" of the "basic constitutional guarantees" that Title II sought to enforce. *Mote*, 284 F. Supp. 3d at 878.

## B.    Historical Inquiry

The Court must "consider the extent to which Title II was 'responsive to, or designed to prevent, unconstitutional behavior.'" *Constantine*, 411 F.3d at 487 (quoting *Boerne*, 521 U.S. at 532).

"Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systematic deprivations of fundamental rights." *Lane*, 541 U.S. at 524. "In the House Report published in conjunction with the 1990 enactment of the ADA, Congressional inquiries and testimony showed that, before the ADA, 'it [was] clear that an overwhelming majority of individuals with disabilities [led] isolated lives.'" *Mason v. City of Huntsville*, No. CV-10-S-0794-NE, 2012 WL 4815518, at *10 (N.D. Ala. Oct. 10, 2012) (quoting H.R. REP. NO. 101-485, pt. 2, at 34 (1990), 1990 WL 125563) (first alteration in *Mason*; second alteration added). Indeed, in the ADA's findings, Congress recognized that "society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(2). In so doing, "Congress in express terms identified the 'isolat[ion] and segregat[ion]' of disabled persons by society as a 'for[m] of discrimination.'" *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 613-14 (1999) (Kennedy, J., concurring in part and concurring in the judgment) (quoting 42 U.S.C. § 12101(2)).

Specifically, Congress recognized that the discriminatory effects of inaccessible transportation posed a pervasive and substantial barrier to the integration of the disabled into American society. The House Report found that "in surveys of 45 communities over 7 years" "inaccessible transportation" was "consistently" identified as "the major barrier [to equal employment], second only to discriminatory attitudes." H.R. REP. NO. 101-485 at 37 (internal

18

quotation omitted); *see also* 42 U.S.C. § 12101(3) (emphasis added) (recognizing that "discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, *transportation*, communication, recreation, institutionalization, health services, voting, and access to public services"). Further, Congress found that "individuals with disabilities continually encounter various forms of discrimination, including . . . the discriminatory effects of architectural, *transportation*, and communication barriers[.]" *Id.* § 12101(5).

Moreover, Congress determined that the irrational discrimination against the disabled in public transportation, in particular, threatened to undermine the promise of the ADA in its entirety. The House Report recognized that "[t]ransportation affects virtually every aspect of American life," H.R. REP. NO. 101-485 at 88, and that transportation is the "linchpin which enables people with disabilities to be integrated and mainstreamed into society." *Id.* at 37. "All of the other promises of equal access under the ADA 'would be meaningless if people who use wheelchairs were not afforded the opportunity to travel on and between the streets.'" *Ability Center*, 385 F.3d at 911-12 (6th Cir. 2004) (quoting H.R. REP. NO. 101-485 at 84).

Congress also documented that discrimination in transportation isolated disabled Americans and barred them from participation in civic life. The House Report stated that people "who cannot get to work or to the voting place cannot exercise their rights and obligations as citizens." H.R. REP. NO. 101-485 at 37. Congress explained that "accessible transportation is a critical component of a national policy that promotes the self-reliance and self-sufficiency of people with disabilities." *Id.* (internal quotation omitted).

As the Fourth Circuit recognized, "[a]fter *Lane*, it is settled that Title II was enacted in response to a pattern of unconstitutional disability discrimination by States and nonstate

19

government entities with respect to the provision of public services. This conclusion is sufficient to satisfy the historical inquiry into the harms sought to be addressed by Title II." *Constantine*, 411 F.3d at 387; *see Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 554 (3d Cir. 2007); *Klingler v. Dir., Dep't of Revenue, State of Mo.*, 455 F.3d 888, 896 (8th Cir. 2006); *Assoc. for Disabled Americans, Inc. v. Fla. Int'l Univ.*, 405 F.3d 954, 958 (11th Cir. 2005); *see also Miller v. King*, 384 F.3d 1248, 1271 n. 25 (11th Cir. 2004) (noting that although "there was little documentation of a history and pattern of disability discrimination in prisons recited in *Lane*, . . . the Supreme Court in *Lane* in effect decided the . . . inquiry as to Title II"); *Cochran v. Pinchak*, 401 F.3d 184, 191 (3d Cir. 2005) (agreeing with *Miller*); *Everbody Counts, Inc.*, 2006 WL 2471974 at *11 (N.D. Ind. 2006) ("[W]e are satisfied that Title II addressed a history of discrimination in the provision of public services including public transportation."). *But see Guttman v. Khalsa*, 669 F.3d 1101, 1118-19 (10th Cir. 2012) (concluding that, pursuant to *Lane*, courts must consider the congressional record on the history of constitutional violations of the particular right at issue); *Toledo v. Sanchez*, 454 F.3d 24, 35 (1st Cir. 2006).

## C. Congruence and Proportionality

The final issue is whether Title II is a congruent and proportional response to the history and pattern of unequal treatment. Here, the Court considers "the remedial measures of Title II *only as they apply to the class of cases implicating the right to be free from irrational disability discrimination*" with respect to public transportation serving a metropolitan area. *Constantine*, 411 F.3d at 488; *cf.* 42 U.S.C. § 12141(2) ("'[D]esignated public transportation' means transportation (other than public school transportation) by bus, rail, or any other conveyance (other than transportation by aircraft or intercity or commuter rail transportation . . . .") that provides the general public with general or special service (including charter service) on a regular and

20

continuing basis."). Specifically, the issue is whether the remedial measures on fixed route systems and paratransit were congruent and proportional to the discriminatory design and construction of public transportation and the resulting segregation and isolation of the disabled.

The Fourth Circuit applied the congruence and proportionality test in *Constantine*, 411 F.3d at 488. First, it determined the extent to which Title II targeted the particular discrimination that Congress sought to address. Considering Title II in the context of public higher education, the Court noted that the ADA bars public entities from excluding disabled students from educational programs on the basis of disability. *Id.* (citing 42 U.S.C. § 12132). It also explained that Congress "imposes an affirmative obligation to make 'reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services' to enable disabled persons to receive services or participate in programs or activities." *Constantine*, 411 F.3d at 488 (quoting 42 U.S.C. § 12131(2)). The Court said, 411 F.3d at 488: "In the context of public higher education, Title II requires state colleges and universities to make reasonable accommodations for disabled students to ensure that they are able to participate in the educational program."

The Court then evaluated the "limitations Congress placed on the scope of Title II." *Id.* at 489. First, "Title II protects only a 'qualified individual with a disability.'" *Id.* at 488. States may limit participation in their programs "for other, lawful reasons." *Id.* As in *Lane*, the Fourth Circuit noted that States need not employ all means to make their services accessible to disabled individuals. *Id.* at 488-89. Rather, they need only make "reasonable" modifications "to ensure disabled citizens have access[.]" *Id.* at 489. Furthermore, they need not "take any action that [they] can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens. *Id.* at 489 (quoting 28 C.F.R.

§ 31.150(a)). This provision permits states to "'show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities.'" *Constantine*, 411 F.3d at 489 (quoting *Olmstead*, 527 U.S. at 604). The Court also observed that "the implementing regulations provide the States several avenues to avoid liability under Title II." *Constantine*, 411 F.3d at 489.

Here, Title II applies, in relevant part, to "designated public transportation" services, like bus or non-commuter rail systems, provided to the general public on a regular and continuing basis. 42 U.SC. § 12141(a). It prohibits public entities, including States, from purchasing or leasing new vehicles that are inaccessible to disabled individuals. *Id.* §§ 12142(a), 12144. It also requires new public transportation facilities and alterations to existing facilities to be "readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs." *Id.* § 12146(a), 12147(a). Finally, public entities that provide public transportation must provide "paratransit and other special transportation services to individuals with disabilities, including individuals who use wheelchairs," that are comparable to the level of services provided non-disabled individuals. *Id.* § 12143(a). These provisions target the discriminatory design of public transportation that Congress described in the evidentiary record. *See, e.g., id.* § 12101(a)(5) ("Congress finds that . . . individuals with disabilities continually encounter various forms of discrimination, including . . . the discriminatory effects of architectural, transportation, and communication barriers[.]").

Congress created several reasonable exceptions to narrow the scope of Title II. First, as noted in *Constantine*, the statute protects only qualified individuals with disabilities. *Constantine*, 411 F.3d at 489. Second, States may limit participation in their public transportation programs "for other, lawful reasons." *Id.*

22

Third, Congress created safeguards to limit the cost burden on the states. With limited exceptions, a public entity need not "make structural changes to existing facilities in order to make such facilities accessible to individuals who use wheelchairs." 42 U.SC. § 12148(a)(2). By so doing, Congress provided relief from "what is probably the most expensive enterprise." *Constantine*, 411 F.3d at 489 (describing importance of Congress allowing public entities not to make structural changes "if other methods effectively make the program or service accessible"). Similarly, if a state "demonstrate[s] to the satisfaction of the Secretary that the provision of paratransit and other special transportation services . . . would impose an undue financial burden" on it, the state need only provide such services that "would not impose such a burden." *Id.* § 12143(c)(4). The DOT may also permit a state to purchase an inaccessible bus where lift-equipped busses are unavailable and the state's good faith efforts to locate a lift manufacturer to supply lifts to the bus manufacturer in sufficient time. *See* § 12145(a).

Nevertheless, the MTA urges the Court to follow the decision of the district court in *Everybody Counts*, 2006 WL 2471974. There, qualified individuals with disabilities sued three municipalities in Indiana for allegedly failing to provide disabled riders with transportation services comparable to the services provided to non-disabled riders. The state was also sued for failing to oversee the municipalities' compliance with the ADA, even though it did not directly provide transportation. Rather, the state provided funds to the municipalities, which in turn used the funds to purchase inaccessible vehicles. The plaintiffs claimed that the state thereby aided in the municipalities' ADA violations.

The district court concluded that Title II was not congruent and proportional for the claim at issue. It relied on three considerations. First, the court recognized that Title II "exposes states to money damages for violations of the ADA by creating a number of affirmative obligations that

the State can only avoid by establishing undue financial hardship." *Id.* at *11. The district court took umbrage with the ADA requiring States to show an "undue financial burden" instead of merely "a rational basis" for failing to comply with the public transportation regulations. *Id.* at *12. These obligations, the district court concluded, do not permit the state "to make classifications that are rationally related to some legitimate governmental purpose." *Id.* (citing *Garrett*, 531 U.S. at 367-68).

This argument misses the point. To be sure, a state could prevail in a suit brought under the Fourteenth Amendment by claiming "a rational basis." *See Garrett*, 531 U.S. at 367. But, Congress may enact "prophylactic legislation" that "proscribe[s] facially constitutional conduct, in order to prevent and deter unconstitutional conduct." *Hibbs*, 538 U.S. at 727-28; *accord Lane*, 541 U.S. at 518. "Thus, the question is not *whether* Title II exceed the boundaries of the Fourteenth Amendment, but *by how much.*" *Constantine*, 411 F.3d at 490.

Second, the district court claimed that the burden on the state was "exaggerated by a statutory scheme that essentially attempt[ed] to hold the state vicariously liable for disability discrimination even where the state [was] not the actual entity proving the transportation." *Everybody Counts*, 2006 WL 2471974 at *12. According to the court, this vicarious liability exposed Indiana to significant oversight responsibilities and financial risks that were "plainly burdensome to a state." *Id.*

However, Ash is suing the MTA as a public entity that operates its own transportation system. He is not seeking to hold the MTA vicariously liable for the acts of a municipality. As a result, the MTA does not bear the "exaggerated" burdens at issue in *Everybody Counts.*

Third, the district court in *Everybody Counts* maintained that courts should rarely abrogate sovereign immunity when a non-fundamental right is at stake. The district court identified the

lone exception of public education. *Id.* at *13 (citing *Constantine*, 411 F.3d at 490; *Assoc. for Disabled Americans* , *supra*, 405 F.3d at 958-59). In the district court's view, "[t]here has long been recognized a history of pervasive discrimination in the specific area of public of public education." *Id.* at *13. By contrast, in regard to public transportation, there is a "general history of discrimination," but not a "specific history of discrimination by the states (as opposed to municipalities)[.]." *Id.*

I am not persuaded. Federal courts have recognized Title II as a congruent and proportional remedy in related cases involving similar non-fundamental rights. *See Mote*, 284 F. Supp. 3d at 879 (concluding Title II properly abrogated sovereign immunity as applied to equal access to publicly-maintained sidewalks and curb ramps); *Mason*, 2012 WL 4815518, at *11 (same). Moreover, the Fourth Circuit gave no indication in *Constantine* that public education is the lone exception to a general rule against abrogating non-fundamental rights for a non-suspect class.

In addition, the specificity of the history of discrimination is of no consequence here. As the district court in *Everbody Counts* had already recognized, "after *Lane*, *it is settled* that Title II was enacted in response to a pattern of unconstitutional disability discrimination by States and nonstate government entities with respect to the provision of public services." *Everybody Counts*, 2006 WL 2471974 at *13 (quoting *Constantine*, 411 F.3d at 487) (emphasis added). It is unclear why evidence of a "general history" of discrimination was relevant in *Lane*, but is no longer relevant here. Nor is it clear why evidence in the congressional record that is probative in the context of a fundamental right is irrelevant in the context of a non-fundamental right. As a result, the fine-parsing of the congressional record employed in *Everybody Counts* is neither necessary nor appropriate here.

Nevertheless, "given the uncertainty on the issue and the fact that the case will proceed under the [Rehabilitation Act] in any event, final determination whether a valid ADA Title II claim exists need not be made now." *Fink v. Richmond*, DKC-07-0714, 2008 WL 9364730, at *8 (D. Md. Mar. 24, 2008). Accordingly, I shall deny MTA's Motion, without prejudice to the MTA's right to renew the claim at a later date.

## VI. Punitive Damages

In the Motion, the MTA asks the Court to strike Ash's claims for punitive damages under the ADA and the Rehabilitation Act. ECF 21-1 at 13. The MTA asserts that punitive damages are unavailable in suits brought under the ADA or § 504 of the Rehabilitation Act. *Id.* In opposition, Ash maintains that the request to dismiss punitive is premature because "Fed. R. Civ. P. 12 only allows dismissal of a 'claim' and the 'relief sought' is not part of the 'claim' under Fed. R. Civ. P. 8(a)[.]" To address plaintiff's procedural concerns, the MTA submitted a separate motion to strike (ECF 24) plaintiff's prayer for punitive damages. Ash did not respond.

"It is well-settled that '[p]unitive damages 'may not be awarded in suits brought under [Title II] of the ADA and § 504 of the Rehabilitation Act.'" *Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 373 (D. Md. 2011) (quoting *Barnes v. Gorman*, 536 U.S. 181, 189 (2002)). Therefore, I shall grant the State's Motion to Strike. Ash cannot seek punitive damages here.

## VII. Conclusion

For the reasons stated above, I shall DENY defendant's Motion seeking partial dismissal, but I shall GRANT its Motion to Strike.

An Order follows, consistent with this Memorandum Opinion.

Date: March 12, 2019

_____/s/_____
Ellen Lipton Hollander
United States District Judge